NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220600-U

NO. 4-22-0600

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 25, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| LAURENCE F. HUNDMAN, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | McLean County |
| STATE FARM BANK, F.S.B., and STATE FARM | ) | No. 21L107 |
| MUTUAL AUTOMOBILE INSURANCE COMPANY, | ) | |
| Defendants-Appellees. | ) | Honorable |
| | ) | Rebecca S. Foley, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the trial court's dismissal with prejudice of
plaintiff's complaint for failure to state a claim for breach of contract.

¶ 2    In August 2021, plaintiff, Laurence F. Hundman, filed a complaint for breach of
contract against defendants, State Farm Bank, F.S.B., and State Farm Mutual Automobile
Insurance Company (collectively, State Farm), alleging State Farm failed to obtain Hundman's
consent to modifications of various loan documents, which resulted in Hundman's losing
property he mortgaged to secure those loans.

¶ 3    In October 2021, State Farm filed a motion to dismiss the complaint, arguing that
Hundman did not have any contractual rights he could enforce against State Farm. In March
2022, the trial court granted State Farm's motion and dismissed the complaint with prejudice.

¶ 4    In April 2022, Hundman filed a motion to reconsider and included in that motion
a request to file an amended complaint. In the proposed amended complaint, which was attached

to the motion to reconsider, Hundman added significant detail to the allegations, explaining the breach and surrounding circumstances. In June 2022, the trial court denied the motion to reconsider and did not grant leave to amend.

¶ 5        Hundman appeals, arguing the trial court erred by (1) dismissing his complaint for failure to state a claim and (2) denying him leave to file an amended complaint. We disagree and affirm.

¶ 6                                    I. BACKGROUND

¶ 7        This case involves a series of commercial loans and the security provided for those loans. We note that the case is complicated by the multitude of actors and companies involved in the loans and their repayment. We attempt to simplify the information as much as possible for ease of understanding.

¶ 8                                    A. The Complaint

¶ 9        In August 2021, Hundman filed a single-count complaint against State Farm alleging breach of contract. Specifically, Hundman alleged that State Farm breached the terms of a "pre-negotiation agreement" pertaining to various loans entered into between State Farm and Hundman's former company. We note that the following material, including the quoted material, comes from allegations in the complaint.

¶ 10                                    1. *The Loan Agreements*

¶ 11        In March 2008, Hundman was the manager of CIP, LLC (CIP), a limited liability company engaged in real estate development in Bloomington, Illinois. CIP was owned by Hundman, Richard Owen, David Stark, and several others. Prior to 2008, the owners of CIP had executed unlimited commercial guaranties in favor of State Farm to guarantee payment of any and all loans between State Farm and CIP.

¶ 12            In March 2008, State Farm entered into multiple loan agreements with CIP. Those loans were secured by mortgages on various tracts of real property, some owned by CIP, and others owned by the managers or owners of CIP. Relevant here, in March 2008, CIP executed a promissory note in favor of State Farm in the amount of $1.15 million (hereinafter referred to as the Loan). As part of the security for that Loan, CIP mortgaged certain real estate located on Ekstam Drive in Bloomington (the Ekstam mortgage), and Hundman mortgaged certain real estate he owned individually located on Westport Court, Bloomington (the Westport mortgage). We note that other property was mortgaged to secure the Loan and the Ekstam properties were earlier mortgaged to secure a separate loan with State Farm. The note had a maturity date of March 2010.

¶ 13            In the years following the March 2008 loans, "the close business relationship between [Hundman] and a number of the other [CIP owners], including Mr. Stark, deteriorated." The complaint alleged that Stark informed others that Stark "intended to pursue[ ] litigation against Mr. Hundman and his family for the rest of Mr. Hundman's life." On March 1, 2010, Hundman entered into a settlement agreement with CIP and its owners "in an effort to sever his ties with Mr. Stark." In exchange for a release of any future obligations to provide capital to CIP, Hundman "transferred his interest in CIP, and in numerous other entities worth millions of dollars, to various of the [CIP owners]."

¶ 14                              2. *The Pre-Negotiation Agreement*

¶ 15            In March, June, and September 2010, CIP and State Farm entered into extension agreements, extending the maturity date of the Loan, which CIP was unable to pay, to November 1, 2010. The complaint then alleged that later in September 2010, after the last extension agreement, "CIP assigned the Ekstam Properties *** to Nokestraw, LLC ('Nokestraw'), an

Illinois limited liability company of which Mr. Stark and Mr. Owen (two of the [CIP owners] and Guarantors) were the principal owners." Pursuant to the assignment, Nokestraw assumed CIP's liabilities for the loans to State Farm that were secured by the Ekstam mortgages. The complaint alleged that this assignment violated the terms of the Loan and "generated animosity with the officers at [State Farm] overseeing that loan."

¶ 16     In January 2011, CIP requested State Farm to enter into negotiations "exclusively with Mr. Stark and Mr. Owen, and their attorneys, *** to explore a resolution of CIP's (and Nokestraw's) liability to [State Farm]." The complaint alleged that the negotiations were sought because (1) CIP faced a multimillion-dollar liability to State Farm under the defaulted Loan, (2) CIP's members, other than Hundman, faced enormous capital calls to satisfy the Loan, and (3) Nokestraw also faced a multimillion-dollar liability to State Farm.

¶ 17     State Farm "preliminarily agreed to CIP's request, provided that, because such an agreement ([what would become the 'Pre-Negotiation Agreement' or PNA]) would jeopardize the enforceability of the Guaranties and the Accommodation Mortgages," the guarantors and grantors were included as parties to the PNA. "In consideration for the Guarantors and Grantors, including Mr. Hundman, consenting to the [PNA], [State Farm] agreed that the [PNA] would *prohibit* [State Farm] *** from entering into any resolution of the *** Loan without the written approval of the Guarantors and Accommodation Mortgag[ors]." (Emphasis in original.) Hundman "agreed to become a party to the [PNA] because of the effective veto power [State Farm] was offering him under the agreement."

¶ 18     In January 2011, State Farm, CIP, Hundman, and the other guarantors executed the PNA. Hundman attached a copy of the PNA to his complaint, the relevant provisions of which provided as follows:

"This Pre-Negotiation Agreement (the 'Agreement') is entered into as of the 24th day of January, 2011 by and between State Farm Bank, F.S.B. ('State Farm') and CIP, LLC (individually, the 'Borrower' and collectively with State Farm, the 'Parties'")."

* * *

[8](q) Approval of Parties. The consummation of any modifications, waivers, amendments or other agreements that State Farm may, in its sole and absolute discretion, choose to enter into, if any, in connection with the Loan will be expressly conditioned on State Farm's receipt of evidence, in form and substance satisfactory to it, of the specific authority of all applicable parties to enter into such agreements, including without limitation, the Borrower [(CIP)] and its constituent entities and any guarantors of the Loan.

***

[8](s) Execution by Guarantors and Grantors. The Borrower shall cause all guarantors of the obligations of the Borrower under the Loan Documents and the Grantors under [the] two Mortgages to execute this Agreement to evidence their consent to and acknowledgement of the terms hereof. State Farm shall require all such guarantors and Grantors to execute any and all agreements requested by State Farm to (i) evidence their consent to the terms of any definitive agreement between the Parties arising from or in connection with this Agreement relating to the Loan or the Loan Documents; and (ii) affirm the continuing effectiveness of their guaranties or mortgages, as applicable, following the entry by the Parties into any such agreement."

¶ 19        In March 2011, consistent with the PNA, State Farm, CIP, Hundman, and the other guarantors approved in writing another extension agreement, extending the maturity date of the Loan to December 31, 2011.

¶ 20                        3. *The Loan Resolution Agreement and Breach*

¶ 21        The complaint alleged that in October 2011, CIP and State Farm negotiated a loan resolution (hereinafter Loan Resolution) that would address CIP's defaults under the Loan. According to the complaint, the Loan Resolution provided that (1) a third party would purchase the Ekstam properties; (2) the proceeds of the sale would be used first to pay in full a separate loan from State Farm to CIP; (3) the remaining proceeds would be applied to the Loan, leaving a balance due from CIP to State Farm of approximately $367,000; and (4) "HOS II, LLC, an Illinois limited liability company in which Mr. Stark and Mr. Owen possessed majority ownership interests[,] would pay" the remaining balance to State Farm. The Loan Resolution further provided that, once these funds had been paid, State Farm would (1) release the Ekstam mortgages, (2) assign the Loan and its accompanying mortgages to HOS II, and (3) agree to assign the commercial guaranties to HOS II at a later date, when CIP paid off yet another loan to State Farm.

¶ 22        The complaint alleged that State Farm never sought or obtained Hundman's authority, consent, or approval of the Loan Resolution. It further alleged that State Farm knew that the only purpose of the Loan Resolution's assignments to HOS II was to enable Stark to collect the remaining balance from Hundman by foreclosing on the Westport mortgage.

¶ 23        In 2013, HOS II foreclosed on the Westport mortgage. Hundman litigated the case until May 2021, spending hundreds of thousands of dollars in legal fees. Hundman eventually settled with HOS II by surrendering all rents and sale proceeds of the mortgage property. The

complaint alleged that had State Farm complied with the terms of the PNA, Hundman "would not have agreed to the Loan Resolution—specifically, to the assignment of the Westport Mortgage—and [State Farm] would have collected" the remaining balance from CIP, Nokestraw, or one or more of the guarantors.

¶ 24                              B. State Farm's Motion To Dismiss

¶ 25        In October 2021, State Farm filed a motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2020)), in which it alleged that the complaint should be dismissed with prejudice because (1) State Farm had a preexisting contractual right to assign the Westport mortgage, which right was preserved in the PNA; (2) the PNA did not require State Farm to obtain Hundman's written consent prior to assigning the Westport mortgage; and (3) "the [n]egotiations did not result in the modification waiver or amendment of the Westport mortgage or other loan documents."

¶ 26        State Farm relied on sections 2 and 4 of the PNA, which provided as follows:

"2. Negotiations.  At the request of the Borrower, the Parties will soon enter into discussions and negotiations about the Loan and the Loan documents (the 'Negotiations'). Without liability for failing to do so, the Parties presently plan to discuss various courses of action which may be taken in connection with the Loan. Either party, in its sole and absolute discretion, may terminate the Negotiations at any time and for any reason. It is understood that the Negotiations *** shall be preliminary in nature and shall not be binding on either Party absent a written agreement executed by both Parties and all guarantors, if applicable, modifying, waiving or amending the terms, conditions or provisions of the Loan Documents.

\*\*\*

4. Effectiveness of Loan Document.  Absent any written agreement executed by both Parties and any guarantor, if applicable, modifying, waiving and/or amending any terms or conditions of the Loan Documents, the Loan Documents shall remain in full force and effect in accordance with their terms."

¶ 27                                    1. *Pursuant to Section 2-619*

¶ 28        State Farm first argued that Hundman's complaint should be dismissed with prejudice pursuant to section 2-619 of the Code of Civil Procedure (*id.* § 2-619) because the terms of the Westport mortgage—which State Farm attached to its motion along with a supporting affidavit—demonstrated that State Farm had a preexisting right to assign the mortgage that was unaffected by the PNA. Specifically, section 4 provided that the loan documents (hereinafter Loan Documents) remained in full force and effect unless modified in writing. Because Hundman did not allege that he and State Farm ever modified the Westport mortgage to limit State Farm's ability to assign, his complaint should be dismissed.

¶ 29                                    2. *Pursuant to Section 2-615*

¶ 30        State Farm further asserted that the provisions of the PNA Hundman relied upon, sections 8(q) and (s), did not require State Farm to obtain Hundman's written consent. Section 8(q), State Farm argued, permitted State Farm to ensure that any person signing an agreement modifying the Loan Documents had the authority to bind the party on whose behalf the person was signing. Because Hundman's complaint incorrectly claimed section 8(q) required his consent, he could never assert a claim for breach under that section.

¶ 31        Regarding section 8(s), State Farm conceded that section 8(s) "require[s] 'all such guarantors and Grantors to execute any and all agreements requested by State Farm to (i)

evidence their consent to the terms of any definitive agreement between [State Farm and CIP] arising from or in connection with this [PNA] relating to the Loan or the Loan Documents." However, State Farm argued that the term "definitive agreement" was defined by sections 2 and 4 of the PNA. Because those sections made clear that the PNA did not affect any preexisting rights unless and until the parties entered into a written agreement "modifying, waiving or amending" the terms, conditions, or provisions of the Loan Documents, written consent was only required if the parties' definitive agreement modified, waived, or amended the Loan Documents. Given that Hundman's claims were predicated solely on State Farm's assignment of the Loan Documents, he could not allege the existence of a definitive agreement, and his complaint should be dismissed pursuant to section 2-615 of the Code of Civil Procedure (*id.* § 2-615).

¶ 32                                    3. *Hundman's Response*

¶ 33        Hundman filed a response in which he contested State Farm's interpretation of the PNA. Hundman argued that section 8(q) applied to *any* agreement relating to the Loan Documents, which would include assignments, and that it required State Farm to obtain the "specific authority of all applicable parties to enter into such agreements, including *** any guarantors of the Loan." Because Hundman was a guarantor, State Farm breached section 8(q) by failing to obtain his authority in any form.

¶ 34        Hundman also contended that State Farm's interpretation of "definitive agreement" made section 8(s) meaningless and duplicative of sections 2 and 4 of the PNA. Because sections 2 and 4 already required a written agreement executed by all applicable parties to modify, waive, or amend the terms of the Loan Documents, section 8(s)'s use of "any definitive agreement between the Parties *** relating to the Loan or the Loan Documents" must be broader than merely amendment or modification of the Loan Documents. Hundman asserted

that, at the motion to dismiss stage, the trial court was required to accept his plausible reading of definitive agreement as "an agreement that permanently resolved the *** Loan."

¶ 35 Last, Hundman argued that State Farm's interpretation of sections 2 and 4 would render the contract meaningless. Hundman asserted that State Farm was asking the trial court to interpret sections 2 and 4 as nullifying any rights granted by the PNA itself because those rights were obviously different from those contained in the Loan Documents. The more reasonable reading was that the PNA itself modified the Loan Documents, including the Westport mortgage, to require Hundman's consent to an assignment when that assignment came from an agreement between State Farm and CIP pursuant to the terms of the PNA.

¶ 36 Alternatively, Hundman maintained that the Loan Resolution described in the complaint did "modify" the terms of the Loan Documents, and therefore was a "definitive agreement" requiring his written consent even under State Farm's own interpretation.

¶ 37 C. The Trial Court's Order

¶ 38 In March 2022, the trial court entered a written order granting State Farm's motion to dismiss. Regarding the section 2-615 motion to dismiss, the court found that section 8(q) "cannot be interpreted to require Plaintiff's consent before State Farm entered into any modifications, waivers, amendments, or other agreements pertaining to the loan." The court noted that although the title to the section was "Approval of Parties," section 8(n) of the contract explicitly provided that paragraph headings are for convenience only and shall not be used to interpret any provision of the contract. The court explained that the plain meaning of "authority" in section 8(q) was not equivalent to "consent or approval." Instead, authority related to being able to enter into an agreement.

¶ 39 Regarding section 8(s), the trial court found that the "definitive agreement" referred to in that section, which required the consent of the guarantors and grantors, was defined by sections 2 and 4 of the PNA. Those sections both emphasized that the terms of the Loan Documents would remain in effect, unchanged, unless and until the parties and all guarantors, if applicable, executed a written agreement modifying, waiving, or amending the terms or conditions of the Loan Documents. Because Hundman did not allege "any modification, waiver or amendment that resulted from the parties' negotiations," the court concluded that Hundman failed to allege a "definitive agreement" was reached and section 8(s) did not apply. Accordingly, the court granted State Farm's motion to dismiss pursuant to section 2-615.

¶ 40 Regarding State Farm's motion to dismiss pursuant to section 2-619, the trial court concluded that the Westport mortgage reflected the intentions of the parties that the mortgage be freely assignable. Given that section 4 of the PNA expressly reserved preexisting rights under the Loan Documents, the court found that the complaint failed to state a claim because it never alleged the parties executed an agreement modifying the terms of the Loan Documents. The court rejected Hundman's argument that the PNA altered the assignability of the Westport mortgage and granted State Farm's motion to dismiss pursuant to section 2-619(a)(9) with prejudice.

¶ 41 D. Hundman's Combined Motion To Reconsider and for Leave To File an Amended Complaint

¶ 42 In April 2022, Hundman filed a combined motion to reconsider the trial court's dismissal of the complaint and for leave to file an amended complaint. Hundman attached a copy of his proposed amended complaint to the motion. The proposed amended complaint contained dozens of additional allegations explaining (1) the relationships between the owners of CIP,

(2) the circumstances surrounding the March 2008 loans, (3) details about Hundman's falling out with CIP, (4) the context surrounding CIP's default and attempts to negotiate a resolution to the Loan, (5) the negotiations and eventual agreement to the PNA, and (6) the specific negotiations giving rise to the resolution agreement between CIP and State Farm and the terms of that agreement. Hundman attached a copy of the "definitive agreement" between CIP and State Farm that he claimed best demonstrated State Farm's breach of the PNA.

¶ 43    In addition to this background information, the amended complaint added a new count II, alleging that State Farm breached its implied obligation of good faith and fair dealing when it failed to comply with section 8(q) of the PNA and notify or receive approval from Hundman.

¶ 44    State Farm objected to the motion to reconsider on the grounds that the motion did not raise any newly discovered facts or changes in the law. Similarly, State Farm asserted that the trial court should not grant Hundman leave to amend because he could have raised all of these allegations in his original complaint, thus making the amended complaint untimely. State Farm further argued that Hundman's claims were still based on inapplicable provisions of the PNA that were unsupported by any allegations of a modification, waiver, or amendment of the Loan Documents.

¶ 45    In June 2022, the trial court conducted a hearing on Hundman's motion to reconsider and heard extensive arguments from the parties. Ultimately, the court denied the motion to reconsider and denied leave to amend.

¶ 46    The trial court explained that the motion to reconsider was based on an alleged error in the application of the law to the facts and not on newly discovered evidence.

"The Court wasn't saying that Mr. Hundman is not an applicable party, but rather the Court was relying on language found within section 8(q) in differentiating between consent, or approval, and authority. Finding that plaintiff could not be interpreted—finding that State Farm could not be interpreted to require plaintiff's consent before State Farm entered into any modifications, waivers, amendments, or other agreements pertaining to the loan. There is a difference between authority and consent. Someone may have authority to do something, but obtaining consent is a completely different matter.

With respect to paragraph 8(s), the Court interpreted the contract as a whole to determine the type of definitive agreement contemplated as a result of the pre-negotiation agreement negotiations, ultimately finding this section did not require plaintiff's written consent.

\*\*\*

Considering the request to add a second count \*\*\*, the Court finds leave to amend is not warranted. In terms of the first factor, which is the curative effect, the proposed amendment does not cure any pleading defect[.] \*\*\* [T]he conduct alleged is in essence the same conduct that was addressed in the count which was dismissed by the Court."

¶ 47    The trial court further found that the prejudicial effect did not impact the court's determination, timing favored Hundman, and promptness favored State Farm. "While no single factor is dispositive, the Court finds that the failure to cure a defect combined with the late request weighs in favor of the defendant, and the request for leave to add Count 2 is denied."

¶ 48    This appeal followed.

¶ 49                              II. ANALYSIS

¶ 50        Hundman appeals, arguing the trial court erred by (1) dismissing his complaint for failure to state a claim and (2) denying him leave to file an amended complaint. We disagree and affirm.

¶ 51                           A. The Applicable Law

¶ 52        As an initial matter, State Farm's motion to dismiss and part of the trial court's order was purported to be based on section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2020)). "A motion for involuntary dismissal under section 2–619(a)(9) of the Code admits the legal sufficiency of the complaint, admits all well-pleaded facts and all reasonable inferences therefrom, and asserts an affirmative matter outside the complaint bars or defeats the cause of action." *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 31, 988 N.E.2d 984. Dismissal is not proper pursuant to section 2-619(a)(9) if the claimed "affirmative matter" is actually one that contests or negates the allegations of the complaint; such a motion is, in fact, a motion for summary judgment. *Id.* ¶ 34.

¶ 53        Here, State Farm argues that the Westport mortgage shows that State Farm was permitted to assign that mortgage without obtaining Hundman's prior consent, contrary to the allegations in the complaint. Accordingly, State Farm's motion was not proper pursuant to section 2-619(a)(9), and we do not engage in any analysis thereunder.

¶ 54                            1. *Section 2-615*

¶ 55        The Illinois Supreme Court recently explained the analysis when reviewing motions to dismiss pursuant to section 2-615 in *Nyhammer v. Basta*, 2022 IL 128354, ¶ 23, in which it wrote the following:

" ' "A section 2-615 motion to dismiss tests the legal sufficiency of a complaint." ' *O'Connell v. County of Cook*, 2022 IL 127527, ¶ 18 (quoting *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31). ' "In reviewing the sufficiency of a complaint, we accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts," and we "construe the allegations in the complaint in the light most favorable to the plaintiff." ' *Id*. (quoting *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006)). ' "[A] cause of action should not be dismissed pursuant to section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." ' *Id*. (quoting *Marshall*, 222 Ill. 2d at 429). Our standard of review for a dismissal under section 2-615 is *de novo*. *Id*. ¶ 19."

¶ 56                    2. *Contract Interpretation*

¶ 57         "To succeed on a breach of contract claim, a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *Ivey v. Transunion Rental Screening Solutions Inc.*, 2022 IL 127903, ¶ 28.

¶ 58         In construing a contract, the primary objective is to give effect to the intention of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232, 874 N.E. 2d 43, 57 (2007). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* at 233. "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson v. Gordon,* 241 Ill. 2d 428, 441, 948 N.E.2d 39, 47 (2011). "A contract must be construed as a whole, viewing each provision in light of the other provisions." *Id.* "The parties'

intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Id.*

> "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used. [Citation.] Further, when parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect." *Id* at 442.

¶ 59                                   B. This Case

¶ 60          Hundman argues that the trial court's interpretation of the PNA was in error and that sections 8(q) and 8(s) gave him enforceable rights against State Farm. Hundman contends that State Farm breached the PNA when it failed to get his "authority, approval, or consent" for the Loan Resolution agreement between State Farm and CIP that resulted in State Farm assigning Hundman's mortgage to HOS II. In the alternative, Hundman argues that the trial court erred by dismissing his complaint with prejudice and not granting him leave to amend the complaint to cure any alleged defects.

¶ 61          It is not entirely clear what the parties were trying to accomplish when they executed the PNA. Fortunately, the meaning of section 8(q) is readily apparent, and that section cannot support any claim by Hundman for breach of contract. Unfortunately, the meaning of section 8(s) is less clear. Nonetheless, section 8(s)'s lack of clarity does not inure to the benefit of Hundman precisely because, whatever the exact meaning of that section, Hundman did not receive any contractual rights under that provision, neither based on its plain text nor based on State Farm's action of assigning the loan to HOS II.

¶ 62                                   1. *Section 8(q)*

¶ 63        Hundman repeatedly complains that the trial court and State Farm have failed, throughout the litigation, to explain why the term "authority" in section 8(q) should not be read as a synonym of "consent" or "approve." At oral argument, Hundman clarified that he was, in fact, arguing that the term "specific authority" means "approval," and he conceded that if this court disagreed with his argument, then he cannot state a claim based on section 8(q).

¶ 64        The dictionary defines "authority" as follows: "Legal Definition *** 2(a): *a power to act* especially over others that derives from status, position, or office[;] (b): *the power to act* that is officially or formally granted (as by statute, corporate bylaw, or court order)[;] (c) *power and capacity to act* granted by someone in a position of control *specifically*: *the power to act* granted by a principal to his or her agent." (Emphases added.) Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/authority (last visited Mar. 24, 2023). Similarly, Black's Law Dictionary provides, "Authority 1. The official *right or permission to act*, esp. to act legally on another's behalf; esp., *the power* of one person *to affect another's legal relations by acts* done in accordance with the other's manifestations of assent; *the power delegated* by a principal to an agent <authority to sign the contract>." (Emphases added.) Black's Law Dictionary (11th ed. 2019). Reading section 8(q) in context, the term "specific authority" refers to the *power* of a person executing an agreement to bind the person or entity on whose behalf that person is signing.

¶ 65        As a reminder, section 8(q) provided as follows:

> "The consummation of any modifications, waivers, amendments or other agreements that State Farm may, in its sole and absolute discretion, choose to enter into, if any, in connection with the Loan will be expressly conditioned on State Farm's receipt of evidence, *in form and substance satisfactory to it, of the*

*specific authority of all applicable parties to enter into such agreements*, including without limitation, the Borrower [(CIP)] and its constituent entities and any guarantors of the Loan." (Emphasis added.)

¶ 66        Reading this provision as a whole, two meanings are immediately clear. First, it provides State Farm, in its sole discretion, the ability to demand whatever evidence it requires to satisfy it that those executing any agreement have the authority to do so. The phrase "in form and substance satisfactory to it" demonstrates unequivocally that only State Farm may enforce this provision in the exercise of its discretion.

¶ 67        Second, the term "specific authority *of all applicable parties to enter into such agreements*" (emphasis added) allows State Farm to demand evidence demonstrating that the individual actually signing the agreement has the authority to bind the entity on whose behalf the individual is signing. More simply, section 8(q) allows State Farm to establish to its satisfaction that the individuals signing on behalf of CIP, its constituent entities, and any guarantors have the actual authority to enter into the agreement.

¶ 68        Hundman's contrary reading of "authority," as synonymous with "consent" and "approval," is inconsistent with the plain language of the PNA and does not fit the context of section 8(q). Such an interpretation renders section 8(q) meaningless. Indeed, neither State Farm nor any contracting party has any need for the nonsensical ability to demand evidence that a person signing an agreement actually agrees with what he or she is signing; execution itself demonstrates that the signor "authorizes" the agreement he or she just signed. All contracts require acceptance.

¶ 69        By contrast, State Farm was already in a preexisting contractual relationship with CIP. And State Farm was worried about the continuing efficacy of the guaranties and mortgages

it had received as security if the negotiations yielded fruitful results. Given the maze of actors and companies with which State Farm was dealing and depended on to secure its multimillion dollar loans, State Farm would benefit from being able to condition any potential agreement upon a showing, to its sole satisfaction, that all the individuals actually executing the agreement had the actual authority on behalf of the company to enter into the agreement and conclusively bind the company.

¶ 70        Here, State Farm clearly believed Hundman had the authority to enter into agreements on his own behalf pertaining to the Westport mortgage and his guaranty because Hundman signed the PNA in those capacities. Given that Hundman had the authority to enter into any agreement, section 8(q) is entirely inapplicable; that is, section 8(q) grants State Farm, and only State Farm, contractual rights, and it does not grant Hundman any enforceable rights at all. Simply put, Hundman cannot, under any circumstances, state a claim for breach of contract based on section 8(q). Accordingly, the trial court properly dismissed the complaint to the extent it relied on section 8(q) to state a cause of action.

¶ 71                                2. *Section 8(s)*

¶ 72        Because section 8(q) does not provide a cognizable breach of contract claim for Hundman, whether Hundman stated a claim turns on the meaning of section 8(s), which reads as follows:

> "The Borrower shall cause all guarantors of the obligations of the
> Borrower under the Loan Documents and the Grantors under [the] two Mortgages
> to execute this Agreement to evidence their consent to and acknowledgement of
> the terms hereof. State Farm shall require all such guarantors and Grantors to
> execute any and all agreements requested by State Farm to (i) evidence their

consent to the terms of any definitive agreement between the Parties arising from or in connection with this Agreement relating to the Loan or the Loan Documents; and (ii) affirm the continuing effectiveness of their guaranties or mortgages, as applicable, following the entry by the Parties into any such agreement."

¶ 73 The term "definitive agreement" is vague and not explicitly defined by the PNA. However, State Farm contends—and the trial court agreed—that other sections of the PNA demonstrate that "definitive agreement" means a modification, amendment, or waiver of the terms or provisions of the Loan Documents.

¶ 74 State Farm seems to concede in its appellate brief, like it did in its motion to dismiss before the trial court, that Section 8(s) requires "all . . . guarantors and Grantors to execute any and all agreements requested by State Farm to . . . evidence their consent to the terms of any definitive agreement between [State Farm and CIP] arising from or in connection with this [PNA] relating to the Loan or the Loan Documents." (Alterations in original). Rather than explicitly contesting whether Hundman's consent was required, State Farm asserts that Hundman's complaint never alleged CIP and State Farm entered into such a "definitive agreement."

¶ 75 Section 2 states that no obligations are created unless there is a written agreement signed by State Farm, CIP, *and* the guarantors, if applicable. Section 4 likewise provides that the rights and obligations under the Loan Documents remain in full force and effect absent a written agreement executed by *both* State Farm and CIP *and* any guarantor, if applicable. A plain reading of these sections, along with section 8(s), demonstrate that the PNA constituted an illusory promise, at least as to any guarantor or grantor. See *Carter v. SSC Odin Operating Co.,*

*LLC*, 2012 IL 113204, ¶ 20, 976 N.E.2d 344 ("An illusory promise appears to be a promise, but on closer examination reveals that the promisor has not promised to do anything.").

¶ 76 Section 5 of the PNA provides that a written agreement executed by State Farm, CIP, *and any guarantor* is necessary to (1) create any new rights or obligations for any person and (2) modify, amend, waive, or alter in any way the preexisting rights and obligations under the Loan Documents. These provisions are circular and potentially self-defeating. In essence, State Farm is required to obtain the written consent of the guarantors only after State Farm has entered into a written agreement executed by CIP *and those same guarantors*.

¶ 77 Hundman alleges—indeed, his entire claim of wrongdoing is based on—State Farm's failure to obtain his written consent to the agreement that resulted in State Farm's releasing the Ekstam mortgage for less than the full balance of the relevant Loan. Because Hundman asserts that he, as a guarantor, never executed any written agreement between State Farm and CIP, he is necessarily asserting that, per the express terms of the PNA, either (1) State Farm never reached an agreement with CIP that required his written consent or (2), and more importantly, State Farm retained all of the rights it possessed under the terms of the Loan Documents, including the right to assign the Loan and the Westport mortgage to anyone it wished.

¶ 78 Hundman's arguments, complaint, and proposed amended complaint contain many allegations that suggest that State Farm promised to give him "veto power" over any definitive agreement that came out of the negotiations pursuant to the PNA. Hundman never alleged or argued that the terms of the PNA were incorrect or did not reflect the intention of the parties; he never suggested a claim for reformation of the PNA. Instead, Hundman, presumably, alleges that these assurances and understandings inform the meaning of the terms of the PNA.

However, the PNA contains an explicit integration clause that provides, "This [a]greement constitutes the entire agreement concerning the subject matter hereof and it supersedes any prior or contemporaneous representations, statements, understandings or agreements concerning the subject matter hereof." Given this provision of the PNA, any allegations in Hundman's complaint that are contrary to the plain language of the PNA are not entitled to consideration. See *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 431-32, 804 N.E.2d 519, 531 (2004) (holding that when a written instrument upon which a claim is based conflicts with the allegations in the complaint to which it is attached, the exhibit controls).

¶ 79       Whatever Hundman believed he was agreeing to, the plain language of the PNA did not require State Farm to obtain his consent prior to (1) accepting less than the full amount of the Loan in exchange for releasing the Ekstam mortgage and (2) selling the Loan and accompanying mortgage to HOS II for the amount of the outstanding balance.

¶ 80       Hundman asserts that the Loan Resolution "definitively resolved CIP's liability" to State Farm under the terms of the Loan. Hundman further contends that he would not have consented to the assignment of the Loan to HOS II. Hundman insists that had he been permitted to "veto" the Loan Resolution, then State Farm would have recovered the remaining balance from CIP or the other guarantors. But Hundman's assertions are speculative.

¶ 81       First, CIP and State Farm did not enter into any "definitive agreement" that fully resolved CIP's liability to State Farm. State Farm and CIP only agreed to sell the Ekstam properties and apply the proceeds of the sale to the Loan. Hundman's complaint acknowledges that CIP still owed roughly $367,000 on the Loan after the sale. Instead, State Farm entered into an agreement with a third party, HOS II, to sell the Loan Documents in exchange for payment of the then-outstanding balance. The Loan was still enforceable against CIP and any security given

for the Loan. Whatever the meaning of "definitive agreement," that term certainly did not include agreements between State Farm and third parties to sell the Loan Documents.

¶ 82    Second, had Hundman vetoed the Loan Resolution, in its entirety or just the assignment, the result would likely have been the same. CIP, as the owner of the Ekstam properties, was free to sell those properties at any time; State Farm could not prevent CIP from selling. Instead, the mortgages provided State Farm a right to the proceeds of any sale of the Ekstam properties up to the full amount of the loans. Although State Farm and CIP agreed to pursue this course of action, they did not need to do so. CIP could have simply done it on its own, no matter how much State Farm or Hundman may have objected.

¶ 83    Similarly, State Farm was always free to assign the Loan at any time without any prior approval. The PNA is crystal clear that State Farm (1) fully retained any and all rights in the Loan Documents and (2) was not required to engage in any negotiations or agree to any modifications of the Loan Documents. Not even CIP had the ability under the PNA to prevent State Farm from assigning the Loan without its approval. Hundman's complaint alleges that State Farm wanted the guarantors and grantors to consent to any agreement because State Farm was concerned that the guaranties and mortgages may be adversely affected by any agreement without consent. Hence, section 8(s) provides that State Farm shall require the guarantors and grantors to execute any agreement State Farm requests to evidence their consent to the terms of any "definitive agreement" and affirm the effectiveness of the guaranties or mortgages.

¶ 84    But section 8(s) is a provision for State Farm's benefit, stating that it will ensure that the existing security for the Loan will continue in full effect if an agreement is reached between CIP and State Farm. Given the wording of section 8(s), it is unclear that the provision is enforceable at all because it contains a promise to obtain consent to a future agreement, the terms

- 23 -

of which are unknown and unknowable. *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29-30, 578 N.E.2d 981, 983-84 (1991). To the extent it can be enforced, only CIP could enforce it. CIP could, arguably, demand that State Farm ensure that the security for its Loan remain in place before finalizing any "definitive agreement" to better protect CIP from insolvency.

¶ 85 Any guarantors, however, could not enforce section 8(s). Section 8(s) is primarily for the benefit of State Farm, and secondarily for the benefit of CIP. Hundman and the other guarantors are at most incidental third-party beneficiaries, who lack the right to sue for a breach of contract. *Salvi v. Village of Lake Zurich*, 2016 IL App (2d) 150249, ¶ 53, 66 N.E.3d 894.

¶ 86 Hundman concedes in his brief that State Farm did not need his approval prior to the PNA to assign the Loan to HOS II, and he concedes in his proposed amended complaint that "[u]nder settled Illinois law and the terms of the Guaranties," the guarantors' signatures were not necessary for any extension agreement to be binding up them. Given that State Farm did not need Hundman's approval under the Loan Documents, and that the PNA explicitly reserved State Farm's rights under the Loan Documents, section 8(s) did not grant Hundman any contractual rights. Moreover, section 8(s) provides, "State Farm shall require all such guarantors and Grantors to execute any and all agreements *requested* by State Farm." (Emphasis added.) Hundman alleges that State Farm never requested his written consent, making section 8(s) inapplicable. (Section 8(s) may also be illusory in that State Farm could avoid its application by simply not requesting consent.)

¶ 87 Section 8(s) is clearly drafted for the purpose of protecting State Farm's rights to any and all sources of recovery on the Loan. Hundman alleged that State Farm was worried about the effect any negotiations may have on the mortgages and guaranties if State Farm negotiated exclusively with Stark and Owen. Section 8(s) is a perfect fit to address this concern.

To the extent State Farm failed to comply, then its fears, if valid, would be realized: State Farm's failure to comply with section 8(s) would mean that its transfer of mortgages and guaranties may (1) be subject to additional defenses or (2) relieve the mortgagors and guarantors from liability. Nonetheless, section 8(s) did not grant Hundman any contractual rights.

¶ 88 Had Hundman vetoed the Loan Resolution, State Farm and CIP both could have acted as they did without his approval. Further, had Hundman vetoed the Loan Resolution, State Farm would have been free to foreclose on the Westport mortgage or sue on Hundman's guaranty to recover the amounts owed under the Loan.

¶ 89 In short, section 8(s) is a provision solely for the benefit of State Farm, whose failure to comply with that provision is at State Farm's own peril.

¶ 90 C. Motion To Reconsider and File an Amended Complaint

¶ 91 Last, Hundman argues that the trial court erred by denying his motion to reconsider and preventing him from filing his amended complaint, which he claims addressed the problems with the original complaint that caused the trial court to dismiss it. We disagree.

¶ 92 We need not address Hundman's arguments in depth because, at bottom, they are predicated on arguments we have already rejected. For instance, Hundman adamantly asserts that count II of his proposed amended complaint, asserting a claim for breach of the duty of good faith and fair dealing, is meritorious and the trial court should have granted him leave to file it. However, Hundman's count II is entirely dependent upon his erroneous interpretation of section 8(q), as that is the very provision he claims State Farm failed to follow in good faith. Hundman cites no other contractual provision in count II as a basis to support his claim.

¶ 93 As we earlier explained (*supra* ¶¶ 64-70), section 8(q) contains provisions to be exercised in State Farm's sole discretion, and the term "authority" used in that section means "to

act legally on another's behalf; esp., the power of one person to affect another's legal relations by acts done in accordance with the other's manifestations of assent." Black's Law Dictionary (11th ed. 2019). Hundman claims "authority" should be given the same meaning as "authorize." Hundman's suggestion conflicts with a plain reading of the contract and cannot, as a matter of law, provide a basis for any breach of contract claim.

¶ 94 Hundman makes various arguments regarding why the trial court's reasoning for denying him leave to file an amended complaint was erroneous. Even assuming Hundman were correct that the trial court's reasoning was flawed, this court reviews judgments, not reasons therefor, and we may affirm on any basis clearly apparent in the record. *People v. Johnson*, 208 Ill. 2d 118, 129, 803 N.E.2d 442, 449 (2003).

¶ 95 But the issue before this court is whether Hundman stated a claim for breach of contract against State Farm based on the pleadings contained in the record. Irrespective of what one may think about State Farm's decision to sell the loan instead of demanding payment from CIP and the other debtors, State Farm was legally entitled to make that decision, and the PNA that Hundman attempts to rely on simply does not support any cause of action against State Farm for breach of contract. The facts and inferences contained in the plethora of allegations in the amended complaint may or may not be able to support some other claim of wrongdoing against someone, but they cannot help establish a breach of contract based on the PNA. Accordingly, we affirm the trial court's judgment.

¶ 96 III. CONCLUSION

¶ 97 For the reasons stated, we affirm the trial court's judgment.

¶ 98 Affirmed.